Next case is Enri Watson. Mr. Graziano, good to have you here, sir. Good morning. May it please the court, Salvatore Graziano on behalf of the lead plaintiff, the Regents of the University of California. The district court here applied the wrong legal standard of inquiry notice dismissing plaintiff's complaint on statute of limitations grounds. When the correct Supreme Court standard decided in the Murr case, the discovery rule was applied. The district court's dismissal should be reversed. The district court's second ground for dismissal, lack of materiality, was also in error and should be reversed under no over review. The key facts that were omitted and misstated to Towers shareholders in the proxy concerned primarily a massive amount of incentive compensation, valued at as much as $165 million for CEO Haley that was privately negotiated by CEO Haley and one Willis activist board member named Oven. The two of them met in September of 2015. That fact, the written documentation they exchanged, their discussion was never discoverable to investors prior to the year of 2017. Based on your own complaint, that's not an incentive compensation, correct? It's a plan and it's not identical but close to what was ultimately agreed on. But you're not, as I read the pleadings, accepting them as true, there was a meeting about compensation where it's discussed, but an agreement was not reached. Is that correct? Yeah, I think the best way we can think of it is the board member from Willis is basically at that point setting a floor on what this incentive compensation is going to be. That's not what you pled. You pled there was a plan and in fact you pled that Haley said there were some things about it he didn't like and then you pled later in paragraph 153 what it actually was and that it was consistent with but not identical to, correct? Correct. We said it was substantially identical and if we just tease out the facts slightly, we see that on September 10th, Haley went out to meet with this Willis board member, that he was presented a written plan, we have a copy of. It was a three-year mega grant that could go up to 300% in value. Based on the stock performing better. Exactly. Which would benefit all the shareholders you say that would buy that material. Yes and I want to get to that but I first want to finish the specifics of what these two men negotiated because I think it's very important. It doesn't change as much as your like this very much. I would like some more upside. What we see is a plan that is a three-year mega grant and it goes from 300% upside to 350% upside. It's exactly what Haley negotiated with and we see something else in the record which I think is very important. An outside consultant comes in after the merger is closed. That outside consultant and this is in A646 through A47 presents a different plan and the CEO Haley's reaction is, and this is quoting him, he was shocked and mystified. Where did this plan come from? I want the value act plan that I've been working with. That's what he says. So this meeting in September really should not be dismissed as some casual conversation. Here you have a board member who's going to be on the compensation committee of the merge company showing Haley that instead of making $25 million through incentive compensation which is what he would make in total in three years, he could make as much as $165 million if this company merged and clearly Aubin and value act were in a position to make this happen and they actually do make it happen. So I don't want to leave this court with the notion that somehow the plan changed. It actually didn't. It was tinkered with because of what Haley requested in September and he got what he wanted. I mean think of it and now I'm worried about analogies given what I saw this morning but you can think of it as someone suggests you join my company as CEO and I think I'll pay you at least a million dollars and the person says well I'd like a little more. That million dollars is absolutely a floor at that point in time and that's exactly what happened here. It's in the record in A46 to 47. I do want to take a step back though and talk about just as a legal matter why the court applied the wrong standard. I think that's a critical problem in this case that should lead to reversal. The court looked at this issue as whether or not shareholders were on enough notice of the possibility of fraud, were there warnings because the court noted that everybody knew and we don't disagree with that Haley would become the CEO of the combined company. If we look at, I don't mean to interrupt you on that point, but if our review is DeNova and we agree with you that the discovery rule should apply, do we have to reverse to apply discovery rule or can we apply that based on the record under a DeNova review? I think this court has the option to do it either way. You can apply the discovery rule and if you do I would like to talk about why the facts here could never have been discovered. We know that there is very serious shareholder dissatisfaction with this deal on Towers' behalf when it's announced. The Willis investors are delighted. They're getting a premium. Their company has been performing poorly. They keep missing their earnings. Towers keeps showing record numbers and here it's proposing a deal where it's going to go down in value by around 9%. No one can understand why Mr. Haley is solely negotiating this deal and causing so much damage to his own investors. They are specifically asking, there's an investor that owns a million shares before the transaction closes and he is specifically asking, do you have any kind of compensation agreement with Uggen? Why are you talking to him and what is going on? Why are they asking those questions? Because as the chief the sole negotiator having a specific unique motive only to him is a very material fact because that person, Haley, is supposed to be playing the role as the fiduciary for all shareholders of Towers. They know he's going to be the CEO. So he's got a conflict based on that alone. Your brief says it's a potential conflict but it's an actual conflict if he's the CEO because even if he didn't have any compensation discussions he knew he'd have a job and presumably at a certain pay level. So they already know that he has a conflict. It seems to me for you to prevail you have to, the allegations have to say that the incremental knowledge or the details of that make it incrementally material over the fact that he's already got a conflict. Do you agree with that? That's exactly where I was going. And my response to that question was what would shareholders have done had they discovered that the sole person negotiating for them has now negotiated with this activist board member from Willis an incentive package worth six and a half times what he's making? I hate to keep cutting you off but that may be true on the maximum amount but for it to be 600% you're combining it with another company. So you're almost doubling the size of the market cap that he's getting paid. So you know it's going to go up. And number two, the only way he gets the maximum amount is if the shareholders benefit too by the stock price going up. Why would that be something that would cause them any concern whatsoever? We're really mixing up issues because first his job is to negotiate and benefit the shareholders in the deal. Yes it is to benefit the shareholders over time and God bless him and let him do great once he's CEO of the combined company but at the time in negotiating this transaction he's there for Tower shareholders not for Willis shareholders and the deal is a very negative deal for Tower shareholders that is all over the record. So the question is is there something motivating this man to take such a bad deal at the time? Yes we want to see the combined company do well absolutely but the thing that I am trying to stress to your honor is that if the shareholders were told he's already in a very improper way negotiated what his compensation can be and it's not twice as much. You know the district court made a mistake because the district court thought he was getting $25 million a year so that adds up to $75 million. Well how much is too much? Would it matter to you? How much is too much before it becomes material? Sure I think that's a fair question and I think I don't have a concrete answer for your honor but what I do know is we have something concrete now with this September meeting. So we have a specific dollar amount worth $165 million the CEO now has the maximum upside of $165 million. He's in a different position. Yes he will be CEO. That's where you get the six and a half times or the $165? I take $25 and I times it by six and a half and I get to $165. It is $165 million, let's not lose sight of this, is an incredible amount of money for Mr. Haley. He's never earned anything close to it. It's an incredible amount of money for anyone and here he is with this special incentive that he doesn't disclose. Had the disclosure been made I can assure this court that what would have happened is he would have been removed as the sole negotiator. Somebody at the board would have had to take this negotiation over. There was already a shareholder uproar as to the bona fides of this deal. No one could understand why was Towers agreeing to a transaction worth getting paid less than its value. It wasn't the Irish tax savings or anything like that because the take under doesn't even look at the synergies of the combined corporation. How come the compensation was approved in June? I know that's the combined company at that time. It was approved. The package was known before in June of 17 it was approved. Let's talk about that. The post merger approval of the merger was fairly approved. That's the more interesting question. The merger was approved by a 62% vote at the end of the day. It was not an overwhelming support of approval. The wills side was overwhelming. There's already serious... Can I just ask a factual question? The post merger salary package was approved with full knowledge that it had been negotiated before the merger? Thank you, Your Honor. Absolutely not. There was no indication of that and I think that probably would have led to another uproar and I failed to point that out, but that's true as well. This approval, by the way, is through a say-on-pay, non-binding vote. You knew that as counsel form in June of 17, didn't you? One of their argument is that you as counsel had knowledge because you were counsel and I don't know if it's you, one of the law firms. If I'm wrong about that, I apologize on the individual, but counsel for the plaintiffs was the same in the appraisal action as counsel in this case, so that information was known to the plaintiff's agent. I don't know when the deposition actually took place from the record, but some of the disclosures took place in February of 17, Your Honor. Sure. I will fill these facts in. My firm was involved in the appraisal action. I was just confused by you because I wasn't... I'm sorry about that. No one at my firm who worked in that appraisal action has worked in this case. They have been walled off. We have never accessed what they knew. The complaint is entirely based on the public record. The law in this particular field is quite clear that you should not and cannot impose an agency principle in a class action. Even if those lawyers knew what they did, they were representing investors who were carved out of this case and they would not have been permitted to share it with anyone else because they were operating under a confidentiality order. So that's how I see that. Is that what you told us in the record or are you just telling us that? No, it's in the record and I can give you a citation because there is a declaration at 89 Winson that makes that quite clear. I see I'm out of time, but I did reserve time for rebuttal. Thank you. Thank you, sir. Mr. Neuwer. Good to have you here, sir. Thank you, Your Honor. Good morning. May it please the Court, John Neuwer from Weill, Gottschall & Mangese on behalf of Willis Towers Watson, Towers, Watson & Co., Willis Group Holdings, John Haley and Dominic Casserly. The District Court's decision we respectfully submit should be affirmed on both of the two independent grounds on which the District Court based its dismissal, both statute of limitations and materiality. The District Court's decision can also, and we respectfully submit should also, be affirmed on several additional independent grounds which the District Court did not reach in its opinion but which we did brief and argue at the District Court level. First, plaintiff's failure to plead that any alleged omission rendered any of the proxy-related disclosures. You're going through the other grounds now? I'm just telling you, introducing what the other grounds are. All right. So the first is that no omission rendered any of the proxies' disclosures misleading. The second is plaintiff's failure to plead see enter. And the third is this agency concept that Your Honor raised. Those are three independent grounds. But let me turn back to additional grounds that you want us to look at that the District Court didn't deal with. You can. You can look at them. I don't think you even need to reach them because I think the first two grounds that the District Court did reach, Your Honor, statute of limitations and materiality, were correct. Did they apply the wrong standard for statute of limitations? No. There was language quoted from this Court's cabinet's decision which is different from the language in the Merck decision. There's no disagreement about what the appropriate standard is. It's the Merck standard. And that standard says that the statute of limitations for a Section 14a claim begins to run when the plaintiff did discover or a reasonably diligent plaintiff would have discovered the facts constituting a violation. Plaintiffs say the District Court got it wrong, applied an inquiry notice standard as opposed to the discovery rule of Merck. Putting aside that the language in cabinet's and the language in Merck is very similar, and plaintiffs in their brief, their opening brief to this Court on page 27, footnote 5, concede that that language is facially similar, the District Court's underlying analysis actually did apply the Merck standard. What the District Court did was entirely consistent with Merck because it correctly held that none of the information that I'm quoting from page 14 of the District Court's decision, none of the information that emerged in 2017 when the initial complaint was filed in this case, materially changed what a reasonable investor already knew by the time of the shareholder vote in December of 2015, and that the facts available to the investing public, this is on page 15 of the Court's decision, by the fall of 2015 were sufficient to put the reasonable investor on notice of the essential facts in the amended complaint. In other words, what the District Court held, and this is completely consistent with Merck, was that all of the material and essential facts necessary to trigger the running of the statute of limitations were already known, that's the key language, already known to the reasonable investor in the fall of 2015. That is the first part of the Merck test, and that is the first part of the cabinet's test. There's no dispute that the first part of both of those tests is, did investors already know? And here, what the District Court found was, yes, indeed, investors already knew all that they needed to know in order to trigger and start the running of this statute of limitations. So while the District Court quoted cabinets, and while the language in Merck is different, the actual analysis, when you read the District Court's opinion that the District Court went through, is completely consistent with Merck, because what the Court is holding at bottom is that everything that needed to be discovered was discovered by a reasonable stockholder. And that's the first part of the Merck test. It's also the first part of the cabinet's test. Specifically, as to what the Court found was actually discovered and already known, the Court found that based on the proxy materials themselves and the publicly available information, including other lawsuits that other Towers Watson stockholders had filed right after this merger was announced. That includes September of 2015 about a conflict of interest, correct? It does indeed, Your Honor. That's the amended complaint in the fiduciary duty action, one of the lawsuits that I'm referring to. That those lawsuits, and more importantly, the proxy materials themselves, let everyone know, let the world know, that Mr. Haley would be CEO of the combined company that was all over the proxy materials. It's in the joint appendix at page 186, at page 134, and at page 225. Everyone knew he was going to be CEO of the combined company. There's no dispute there. Everybody knew that as CEO of the much larger combined entity, he was going to make more money. There were two constituent corporations. This was a merger of equals. They were going to combine. Everyone knew that he was going to make more money. That was alleged in the amended complaint in the fiduciary duty action in September of 2015 that Your Honor just mentioned, at pages 743 and 760 of the joint appendix, and that was being complained about by stockholders who were upset with this transaction, Dry House, that counsel mentioned. Also, one of the independent proxy services, ISS, raised that issue. Those pieces of information are in the joint appendix at 679 and 690. All of that seems to flow logically that, you know, you've got a bigger company, the CEO is going to garner a larger salary, but certainly no one knew the specifics of this reported plan, and of course, this is an allegation in the complaint. I imagine you might dispute that, but as to what that salary increase would be, which is rather substantial. I mean, it would seem to me that a lot of people would want to know that. Well, this gets into the materiality point, Your Honor, and it's a good question. But what people knew was he was going to be the CEO, he was already making a lot of money, he was going to make more money because the companies were combined, and this is really a materiality question. And the test for materiality, as the Court knows, is the Supreme Court's TSC standard. Did the information, the allegedly omitted information, significantly alter what a reasonable stockholder would want to know? In other words, did it significantly alter the total mix of information made available? You ask the question, would that incremental amount be material? And I submit that the District Court got this right. The answer is no. Everyone already knew that Mr. Haley was going to make a lot more money than he already was. And the question is, was that delta between him being a wealthy CEO and perhaps if he What about the allegation that this was done sort of under the cover of darkness, secret negotiations, that kind of thing? Why wouldn't a reasonable shareholder want to know that? Well, it's not enough for a reasonable shareholder to want to know, Your Honor. And in fact, the Malin decision... You're saying that, but you're not telling me why. Well, let me give you the law first. The Malin decision specifically says, that's the Eastern District of Virginia, that mere relevance is insufficient to trigger a duty to disclose. Something being simply nice to know, and that's, I think, Your Honor's question, is not enough to trigger a duty to disclose. The law is, is there a substantial likelihood that the omitted fact would be viewed by the reasonable stockholder as significantly altering the total mix of information made available? Why isn't that a question for the jury?  This seems to be, to me anyway, to be a close enough question that we ought to let 12 people figure it out. Well, the answer is, sometimes materiality is a question for the jury, and sometimes it's not. This Court's greenhouse... Generally, it is, isn't it? Well, this Court's greenhouse versus MCG capital decision from 2004, 392 F3rd 650, says, no shortage of cases make clear that materiality may be resolved by a court as a matter of law. Isn't one of the issues that affects materiality not just the maximum amount that could be achieved, but the fact that if that is achieved, the shareholders who now are complaining about it would benefit? Sure. I mean, that's absolutely true, Your Honor. It's not like the 165, regardless of how the company performs, correct? Right. Remember, and you're absolutely right, the supposed 165 was based on a performance goal. I thought he said 165. 165. I thought you just said 155. I meant to say 165 if I said 155, Your Honor. But that was based on meeting certain performance hurdles. And by the way, they were incredibly ambitious performance hurdles. Mr. Haley would have had to double the size of the market capitalization of the combined company in order to potentially... You don't disagree with his numbers, but you say that there were a lot of conditions to ever getting to the top number. It was incentive compensation. It was something that was incredibly difficult to achieve. He would have had to have doubled the market capitalization of the combined company in two years. Maybe that'd be more of a reason to let a jury take a look at it. Well, I think it goes back to Judge Diaz's question. Is that delta between the world knowing that he was going to be CEO, that he was going to be a wealthy CEO at that because he was now going to be running a much bigger company? And as a result... And you say they knew that. They absolutely knew that. They knew he was going to be a wealthy CEO. There's no dispute about that, Your Honor. There's no dispute about that because we know he was a wealthy CEO running a constituent corporation. We're really hitting streams here this morning from this little lady down here in Wise County to $165 million a year for one fellow. So the world knew... That's a compliment to the legal system in this country, I'll say that. The world knew that he was going to be CEO, that he was going to be a wealthy CEO. And as a result of those things, and stockholders knew this when they were asked to vote, they knew he was the lead negotiator on this transaction. They knew he was a conflicted negotiator. And the question is, based on this discussion that he had, this was not an agreement. It was a discussion. Value Act had no ability to negotiate on behalf of Willis. It had no ability to bind Willis. It certainly had no ability to enter into an employment agreement on behalf of a company that did not yet exist. Can I get back to Qualabom's question to you about how Mr. Willis had re-incentived to maximize shareholder value going forward? I get that. But the question is, what incentive did he have to maximize shareholder value with respect to the merger stock price? And there's an allegation in the complaint that he had very little incentive because his immediate short-term incentive was to close the deal in order to get the salary package approved. Why isn't that something that a shareholder would want to know? Everyone knew, every stockholder knew that he was in line for greater compensation. That's where I keep coming back to, Your Honor. And so stockholders knew that. They knew he was conflicted in negotiating. They knew, putting aside for a second the $165,000, that he had a powerful incentive to get this transaction signed up and closed because he was going to be the CEO of the combined company. And as a result, he was going to be in a better position financially. And so it really all continues to come back to on the materiality question. You agree that he had a conflict. There's the question of whether it should have been disclosed or not. It was. The conflict itself was disclosed. No, no, no. I agree. I agree that he had a conflict, and I agree that the conflict was disclosed. And that's what's important. They say it wasn't adequately disclosed. That's what they're saying. That's right. And the securities law is obvious. That's where we are here. That's where we are. And they're saying that the fact of this discussion, which clearly was not an agreement, it's not fled in the complaint, and it can't be. It clearly wasn't an agreement. They're saying the fact of this discussion, even though it wasn't a binding agreement, and the fact that based on what was discussed, he had the potential, if he doubled the market capitalization of the company over two years of the combined entity to potentially earn $165 million, that delta. Can we consider the fact that the agreement, the final agreement, appears at least to be substantially similar to what was talked about, even if it wasn't an agreement on the front end? I think you can consider it because it's in the record, Your Honor. It wasn't exact. There was actually more incentive comp for Mr. Haley in the final agreement. There were also things in the final agreement that were nowhere discussed during the September meeting with Value Act, including base compensation and bonus. So what was discussed in September was simply this incentive piece of compensation. And that's in the record. Is it at all material that the person talking to Mr. Willis on the front end of this merger was one of the largest shareholders of the merged company? Well, he sat on the board of... He was the second largest shareholder of Willis, the counterparty to the transaction. Why isn't that material? I don't think that... Well, everybody knew that, and this was a separate alleged omission in the complaint, whether Value Act was involved in a proponent of this transaction. That was fully disclosed. Value Act signed a voting agreement in support of this merger. And that's disclosed throughout the proxy materials. Value Act was a loud proponent of this transaction. Everybody knew that. That was all disclosed in the proxy materials. So to the extent that the question is, wasn't it material that everybody knew that Value Act was behind this, that Ubin was behind this and very much wanted this to happen, that was all out there. But there was no knowledge that he was behind the negotiation with the future CEO as to what his salary package would be. He wasn't. He had a discussion with the future CEO in September of 2015 that was not in an agreement in which he had absolutely no authority to have. Doesn't the complaint allege that in response to a question about whether there were discussions with Value Act about Haley's compensation, there was a response from Watson that didn't mention the specific meeting. But in the complaint itself, it says, yeah, there were discussions between the Watson Towers Board and Value Act. Isn't that alleged by the plaintiff in the complaint? That there were discussions between Value Act and the representatives of the Watson Towers Board. I believe that allegation appears in the complaint, Your Honor. I think that's it. Paragraph 130. Okay. So that's really the materiality question that I think much of the argument has been focused on. Is that delta between what the world already knew, that he was going to be CEO, that he was a conflicted CEO, and he was going to be a wealthy CEO. Is that delta material? That's the materiality question. And under the TSC test, whether there's a substantial likelihood that a reasonable investor would have thought that that delta significantly altered the total mix of information, that's really the question. And I respectfully submit that the district court got that right. It wasn't an actual agreement. They already knew that he was going to make a lot of money. And the rest was a mere detail. And he may have breached, I'm not asking you to concede this, but it's not the most seemly sort of behavior. I mean, to have this meeting when you're doing that. It may be a breach of fiduciary duty. I mean, it may or may not be. But here we're talking about a different question. Well, I certainly don't concede that it was a breach of fiduciary duty. I wouldn't expect you to. And it was a discussion that he had where Value Act was presenting its compensation philosophy. It was not a binding agreement. And after the transaction was announced, there was an independent compensation consultant that came in and engaged in a negotiation around his compensation, which then was not approved in March of 2016, which is six months after that September 2015 discussion. So that's the materiality analysis. There are two other alleged omissions that the plaintiffs complain about that were not disclosed in the proxy. One was that Mr. Haley supposedly only negotiated for the minimal amount of additional consideration when the renegotiation of the transaction took place. That to me seems a little bit odd. I mean, I don't know why Mr. Willis would have had to disclose that. I do think, though, that it's relevant to the question of whether or not these earlier negotiations somehow conflicted him so much that he simply was looking out for his own interests. They seem to be part and parcel of the same thing. I see I'm out of time, Your Honor. Would you like me to respond to that? Yeah. Well, first of all, that whole allegation that he negotiated for the minimal amount of additional consideration was, in fact, disclosed in the joint appendix at page 534 and 535. So to the extent that that's being called an omission, it was no omission. And to the extent it's being called a material omission, it couldn't have been material because it was actually disclosed. But the language in the deposition wasn't disclosed. That's what he's referring to, that the numbers were disclosed. Well, it was actually disclosed specifically in the proxy that Mr. Haley, quote, negotiated I'm sorry, that Mr. Haley believed an increase in the pre-merger special dividend to at least $10 per share would be necessary. That's what was asked about in the deposition. Well, that's a little bit different than saying that's all I'm going to negotiate, too. I'm just going to accept the minimum and roll over like a cheap suit after that. Well, what the proxy is disclosing is that he told his counterparty that at a minimum $10 was going to be necessary. It doesn't mean that that's all he was going to take at the end of the day. That was just his negotiating posture. And what he did was disclosed in the proxy. Stockholders knew that. They knew exactly how he negotiated this transaction. If they had an issue with it, they could have voted it down. So for all those reasons, your honors, materiality, statute of limitations, and the three reasons that I mentioned at the beginning, which we have not discussed, the district court opinion can be affirmed. Thank you very much, sir. Thank you. Appreciate it. Mr. Horvath? Mr. Horvath has three minutes. Then we come back to you, sir. Good morning, and may it please the court. Good to have you here, sir. On behalf of Value Act Capital Management and Jeffrey Ubbin, the district court correctly dismissed plaintiff's Section 14a claim for failure to state a claim, and as a result, also correctly dismissed the secondary claim for controlled person liability under Section 20a. As a result, the district court did not reach our alternative arguments that plaintiffs failed to plead controlled person liability. I want to briefly note that those arguments are preserved. They have not been raised on appeal. I also want to briefly address some of the questions regarding the September 2015 discussion. There was nothing improper about that discussion. It's important to remember what was happening at the time. The merger had been signed up for two months. It had already been disclosed that Mr. Haley was going to be the CEO of the combined company. At that point, Mr. Ubbin had a single meeting with Mr. Haley where he discussed his views on compensation philosophy based on pay-for-out performance. That conversation happened when there were no active renegotiations about the merger. In fact, those negotiations did not happen until two months later. Now, at that time, so you look at it, the merger was signed up, and there was nothing wrong with that conversation because everyone was proceeding as to the deal that was going to take place. There was a question before as to whether or not that was a breach of fiduciary duty. Well, I could point to two cases off the top of my head. One cited in the brief, C&J Energy Services v. City of Miami, where there was a discussion about compensation after the financial terms of a merger of equals had been negotiated. The court found there was no breach of fiduciary duty on that. Another Delaware case, Parnes v. Valley Entertainment, after Merton signed up, there were discussions with the CEO of one of the companies that was being acquired about his post-merger compensation and other post-merger agreements. That was okay. Does your, does, aren't those separate issues whether or not you're right or not? Aren't they separate? I mean, could he breach his fiduciary duty to his shareholders and the proxy statement still not be materially misleading? So, could he breach his fiduciary duty and the proxy not be materially misleading? Yes, because even in that situation, if, for example, the conflict was disclosed as it was disclosed here, there would be no proxy violation. So, with that, those are the points I wanted to make briefly. Thank you, Your Honor. Very good. Good to have you here, sir. Mr. Graziano, now. You've got seven minutes reserved. Thank you, Your Honor. I want us to go back to the say-on-pay shareholder vote after the transaction closed. There are a couple of facts I want to bring to the Court's attention. Half the people voting at that point were Willis shareholders. This is a different group of shareholders voting. The deal is not open, and that's the critical point. So, at this point, everybody's interest is to incentivize the CEO to do as well as he can for the combined company. But that's a completely different question as to whether he is getting the best price at the time Towers is negotiating with Willis. And I think I want to clarify something. There is no public disclosure of Oven's role. Paragraph 130 was a private email. That did not become public until 2017. The first person that Haley from Towers speaks to when he has to raise the price is, strangely enough, Oven from Value Act, this activist board member. He doesn't speak to Casserly, who is the CEO he's supposed to be negotiating with Willis. It's very curious, because he says to him, I need $10, and Oven responds, doesn't trouble me. That's who he goes to. He goes to the person who flashed that amazing amount of future compensation to him. You're leaving out some facts there, aren't you? Aren't you leaving out that, as you point out, there was concern about the terms from Watson Towers shareholders. He goes to renegotiate. They're contractually bound to a number. He first proposes $10 a share. In that discussion, it's initially rejected, and there's a counter at $9.74. And then they do end up with $10 based on the way he says it. And so it's not like there's one comment he goes, no problem. I mean, you've left out some steps that are in the proxy. I actually left out the steps because I disagree with those steps as portrayed in the proxy. So let me explain what I'm saying. The first person Haley speaks to is Oven. He says, I want $10. Oven says, doesn't trouble me. So perhaps the proxy is correct when it goes through the chronology in between, which only happens after November 10th. Perhaps it's not. We are not in a position today to accept the proxy statements as all true. The complaint is what should be given as true. But even if the proxy is correct, that it started out with a back and forth at $9.75, Haley already knew that he had Willis, board member Oven, backing him on $10. It wasn't really a real negotiation. They had it wired, is what I'm saying, and what the complaint says as of November 10th. And it's particularly curious that this discussion with all the back and forth contained in the proxy is nowhere mentioned. There is no public description of Oven's role in this until 2017. Paragraph 130 is a private email. Paragraph 132 is where one investor is trying to find this out. And he is treated very offensively by this Willis person. And I don't want to repeat the words, but they're all in the complaint in paragraph 132. So I want to first talk about how that say on pay vote is completely different circumstances. But secondly, I want to go back to Merck now, which strangely was actually my case. And I litigated that case until the eve of trial. And there's a very important analogy between this case and Merck. In Merck, there were so many lawsuits on file. And the Supreme Court in a 9-0 opinion when it established the discovery rule said, those allegations are not enough. What we have here in Delaware are unsupported allegations. This is what I argued to the district court below. Those are not enough under the Merck standard. A public debate is not enough. The facts here are highly unusual. This was very wrongful behavior on Oven's part with Haley. The details matter. Those details did not become public until 2017. I do agree. This is now a jury question. It really shouldn't be dismissed as a made-up fact what happened in September. First of all, we actually have documents and emails. And the documents and emails are corroborating what the testimony is in terms of what happened in September of 2015. So I think it would be a grave mistake to dismiss all of this as immaterial without having a jury trial. There's another procedural point even before that, right? I mean, we're at 12B stage. There could be a summary judgment issue too, correct? Absolutely. We should be entitled to do some discovery of the people in the room. I think there's another critical point that I don't want to see glossed over. When Haley met with Oven, they agreed to be talking about one piece of his compensation. The biggest, but the incentive compensation piece. The email that happens later says, Haley and I did not discuss his bonus, his salary. We are focused on the incentive comp package. So yes, that is different after the deal. But everyone admits that's not something they were focused on. They were focused on the big one, the $165 million big one. And that's what those two men discussed. They left a bonus and other terms for a later date. The head of the new compensation committee, when these companies are combined, the first question she has is to Mr. Oven, tell me what you talked about with Haley so I know. Then as the process plays out, and as I said before, this outside consultant is brought in, the deal cannot change. And Haley, of all people, says he wants the Value Act deal, and that is what he got. Now, this is not something that should be dismissed away as typical or usual. This is a very highly unusual fact. It never happens. And even in the Lear case, Chief Judge in Delaware was disturbed by something far more benign than this. There in Lear, the CEO was interested in selling out his current stock, and he couldn't do it unless he took the company private. Judge said that sole negotiator was operating under a unique conflict of interest. Here we're well beyond something like that because he at least owned the stock in Lear. This person is now being awarded an incentive package that is just multitudes bigger. Anyone could have guessed just by becoming the potential conflict as new CEO. Maybe the market cap of these companies would have doubled. You could expect his compensation would double. Maybe it's a little more than double. But here we're talking about six and a half times in just the one piece of the package. He also got a bonus and other things. So with that, Your Honors, I urge this Court to recognize that the District Court applied the wrong standard on statute of limitations grounds. It should have left a materiality question to the jury. And I thank this Court very much. Thank you. We appreciate counsel's arguments. We're going to come down and bring counsel and then make a short break. Thank you.
judges: Robert B. King, Albert Diaz, A. Marvin Quattlebaum Jr.